KCB:DEL/ADR
F. #2024R00023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                        No. 24-CR-50 (HG)

JOHN RAGANO,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S MOTIONS <u>IN LIMINE</u> TO ADMIT CERTAIN EVIDENCE AND PRECLUDE CERTAIN EVIDENCE AND ARGUMENTS AT TRIAL

BREON PEACE
United States Attorney
Eastern District of New York

Devon Lash
Andrew D. Reich
Assistant United States Attorneys
    (Of Counsel)

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

RELEVANT BACKGROUND ................................................................................. 1

I.      Ragano's Extortionate Loan to John Doe in 2021 .................................... 2

II.     Ragano's Involvement in Marijuana Trafficking ..................................... 3

III.    Ragano's Arrest in September 2021, Initial Pretrial Detention and Pretrial Supervision .. 4

IV.     Ragano's Conviction and Sentence for the 2021 Loan ............................ 6

V.      Ragano's Continued Efforts to Collect Payments on the 2021 Loan ............... 7

ARGUMENT ....................................................................................................... 11

I.      Evidence Related to the 2021 Loan and Ragano's Ties to Organized Crime and Reputation Is Admissible .................................................................. 11

        A.      Applicable Law ............................................................................ 12

        B.      The Related Evidence is Admissible .................................................. 17

II.     Statements By Co-Conspirator #1 Are Admissible .................................... 34

        A.      Applicable Law ............................................................................ 34

        B.      Co-Conspirator #1's Statements Are Admissible ................................. 37

III.    Should Ragano Choose to Testify, the Court Should Permit Cross Examination on Ragano's Prior Convictions ................................................. 40

        A.      Applicable Law ............................................................................ 41

        B.      Ragano's Prior Convictions Should Be Permitted on Cross Examination .......... 42

IV.     Evidence or Argument Suggesting Selective Prosecution or Improperly Impugning the Government's Investigatory Conduct Should Be Precluded ............................................. 45

REQUEST FOR SEALING ..................................................................................... 48

CONCLUSION .................................................................................................... 49

**TABLE OF AUTHORITIES**

Page(s)

Cases

Bourjaily v. United States,
   483 U.S. 171 (1987) ..................................................................................... 35, 37

In re Terrorist Bombings of U.S. Embassies in E. Afr.,
   552 F.3d 93 (2d Cir. 2008) ................................................................................ 36

Jones v. City of New York,
   No. 98-CV-6493 (LBS), 2002 WL 207008 (S.D.N.Y. Feb. 11, 2002) .................................. 42

Jones v. N.Y. City Health & Hosps. Corp.,
   102 F. App'x 223 (2d Cir. 2004) ........................................................................ 41

Lutwak v. United States,
   344 U.S. 604 (1953) ....................................................................................... 14

Michelson v. United States,
   335 U.S. 469 (1948) ..................................................................................... 24, 30

Quartararo v. Hanslmaier,
   186 F.3d 91 (2d Cir. 1999) ............................................................................... 35

Sanders v. Ritz-Carlton Hotel Co., LLC,
   No. 05-CV-6385 (PKL), 2008 WL 4155635 (S.D.N.Y. Sept. 9, 2008) ................................. 44

United States v. Alexander,
   48 F.3d 1477 (9th Cir. 1995) ............................................................................ 43

United States v. Allen,
   No. 15-CR-95 (AJN), 2018 WL 1889759 (S.D.N.Y. Apr. 17, 2018) .................................. 18

United States v. Alli-Balogun,
   72 F.3d 9 (2d Cir. 1995) .............................................................................. 31, 48

United States v. Amato,
   15 F.3d 230 (2d Cir. 1994) ............................................................................... 37

United States v. Aminy,
   15 F.3d 258 (2d Cir. 1994) ............................................................................... 16

United States v. Amodeo,
   44 F.3d 141 (2d Cir. 1995) ............................................................................... 49

United States v. Andreadis,
   366 F.2d 423 (2d Cir. 1966) .............................................................................. 18

United States v. Araujo,
   79 F.3d 7 (2d Cir. 1996) .............................................................................. 16, 31

United States v. Armstrong,
   517 U.S. 456 (1996) ...................................................................................... 46

United States v. Barone,
   913 F.2d 46 (2d Cir. 1990) ............................................................................ 34, 35

United States v. Bellomo,
   176 F.3d 580 (2d Cir. 1999) .............................................................................. 35

United States v. Black,
   88 F.3d 678 (8th Cir. 1996) .............................................................................. 27

i

United States v. Brown,
    606 F. Supp. 2d 306 (E.D.N.Y. 2009) ............................................................ 42
United States v. Burton,
    525 F.2d 17 (2d Cir. 1975).......................................................................... 27
United States v. Carboni,
    204 F.3d 39 (2d Cir. 2000).......................................................................... 12
United States v. Chan,
    No. 97-CR-1053 (PKL), 2002 WL 46994 (S.D.N.Y. Jan. 14, 2002) ...................... 19
United States v. Chartier,
    No. 17-CR-372 (JS), 2021 WL 3795352 (E.D.N.Y. Aug. 26, 2021) ...................... 39
United States v. Chervin,
    No. 10-CR-918 (RPP), 2013 WL 124270 (S.D.N.Y. Jan. 10, 2013)...................... 45
United States v. Colon,
    880 F.2d 650 (2d Cir. 1989)......................................................................... 15
United States v. Concepcion,
    983 F.2d 369 (2d Cir. 1992) ........................................................................ 12
United States v. Coonan,
    938 F.2d 1553 (2d Cir. 1991) ...................................................................... 13
United States v. Crumble,
    No. 18-CR-032 (ARR), 2018 WL 2016852 (E.D.N.Y. May 1, 2018) ..................... 42
United States v. Curcio,
    310 F. Supp. 351 (D. Conn. 1970)................................................................. 22
United States v. Daly,
    842 F.2d 1380 (2d Cir. 1988) ...................................................................... 13
United States v. Davis,
    890 F.2d 1373 (7th Cir. 1989) ................................................................ 34, 35
United States v. Delpit,
    94 F.3d 1134 (8th Cir. 1996) ....................................................................... 27
United States v. Demosthene,
    334 F. Supp. 2d 378 (S.D.N.Y. 2004)............................................................. 48
United States v. Dennis,
    625 F.2d 782 (8th Cir. 1980) .............................................................. 23, 25, 26
United States v. Desena,
    260 F.3d 150 (2d Cir. 2001)..................................................................... 36, 38
United States v. Detrich,
    865 F.2d 17 (2d Cir. 1988).................................................................... 34, 35
United States v. Diaz,
    176 F.3d 52 (2d Cir. 1999).......................................................................... 13
United States v. Dominguez-Gabriel,
    511 F. App'x 17 (2d Cir. 2013) .................................................................... 35
United States v. Dunloy,
    584 F.2d 6 (2d Cir. 1978)................................................................. 34, 35, 48
United States v. Estrada,
    430 F.3d 606 (2d Cir. 2005)......................................................................... 42
United States v. Everett,
    825 F.2d 658 (2d Cir. 1987)......................................................................... 16

ii

United States v. Farhane,
  634 F.3d 127 (2d Cir. 2011)..................................................................47
United States v. Farmer,
  583 F.3d 131 (2d Cir. 2009)..................................................................28
United States v. Fazio,
  770 F.3d 160 (2d Cir. 2014)...........................................................24, 26
United States v. Frank,
  11 F. Supp. 2d 314 (S.D.N.Y. 1998)....................................................19
United States v. Frederick,
  702 F. Supp. 2d 32 (E.D.N.Y. 2009) ....................................................18
United States v. Garcia,
  291 F.3d 127 (2d Cir. 2002)..................................................................14
United States v. Gigante,
  166 F.3d 75 (2d Cir. 1998).............................................................passim
United States v. Gigante,
  729 F.2d 78 (2d Cir. 1984)............................................................24, 26
United States v. Gilbert,
  668 F.2d 94 (2d Cir. 1981)............................................................43, 45
United States v. Gonzalez,
  110 F.3d 936 (2d Cir. 1997)..................................................................12
United States v. Graziano,
  558 F. Supp. 2d 304 (E.D.N.Y. 2008) ...........................................13, 18
United States v. Guerrero,
  882 F. Supp. 2d 463 (S.D.N.Y. 2011)............................................17, 33
United States v. Harris,
  733 F.2d 994 (2d Cir. 1984)..................................................................16
United States v. Hawley,
  554 F.2d 50 (2d Cir. 1977)....................................................................43
United States v. Hayes,
  553 F.2d 824 (2d Cir. 1977)..................................................................42
United States v. Hill,
  658 F. App'x 600 (2d Cir. 2016) ...........................................................29
United States v. Hourihan,
  66 F.3d 458 (2d Cir. 1995)....................................................................42
United States v. Inserra,
  34 F.3d 83 (2d Cir. 1994)......................................................................13
United States v. Knox,
  687 F. App'x 51 (2d Cir. 2017) .............................................................46
United States v. Kone,
  216 F. App'x 74 (2d Cir. 2007) .............................................................35
United States v. Langford,
  990 F.2d 65 (2d Cir. 1993)..............................................................14, 30
United States v. Levy,
  731 F.2d 997 (2d Cir. 1984)..................................................................15
United States v. Loera,
  No. 09-CR-466 (BMC), 2018 WL 2744701 (E.D.N.Y. June 7, 2018)....................47

United States v. Maldonado-Rivera,
   922 F.2d 934 (2d Cir. 1990).................................................................. 39

United States v. Malka,
   602 F. Supp. 3d 510 (S.D.N.Y. 2022)................................... 36, 37, 39

United States v. Mendez,
   165 F.3d 15, 1998 WL 802127 (2d Cir. 1998) ................................ 14

United States v. Mickens,
   926 F.2d 1323 (2d Cir. 1991)...................................................... 15, 29

United States v. Miller,
   116 F.3d 641 (2d Cir. 1997)................................................................ 12

United States v. Mitchell,
   328 F.3d 77 (2d Cir. 2003)................................................................. 27

United States v. Moore,
   735 F.2d 289 (8th Cir. 1984) ............................................................. 14

United States v. Mulder,
   273 F.3d 91 (2d Cir. 2001)................................................................. 26

United States v. Natale,
   526 F. 2d 1160 (2d Cir. 1975).................................................... 22, 23

United States v. Nektalov,
   325 F. Supp. 2d 367 (S.D.N.Y. 2004).............................................. 19

United States v. Ortiz,
   553 F.2d 782 (2d Cir. 1977).............................................................. 44

United States v. Ortiz,
   857 F.2d 900 (2d Cir. 1988)...................................................... 14, 15

United States v. Pacheco,
   902 F. Supp. 469 (S.D.N.Y. 1995) ................................................... 19

United States v. Pacione,
   738 F.2d 567 (2d Cir. 1984).......................................... 22, 23, 26

United States v. Pascarella,
   84 F.3d 61 (2d Cir. 1996).................................................................. 31

United States v. Paulino,
   445 F.3d 211 (2d Cir. 2006).............................................................. 16

United States v. Payton,
   159 F.3d 49 (2d Cir. 1998).......................................................... 41, 44

United States v. Pedroza,
   750 F.2d 187 (2d Cir. 1984)...................................................... 18, 19

United States v. Pena,
   978 F. Supp. 2d 254 (S.D.N.Y. 2013)............................................... 31

United States v. Peterson,
   808 F.2d 969 (2d Cir. 1987).............................................................. 16

United States v. Pipola,
   83 F.3d 556 (2d Cir. 1996)......................................................... 15, 31

United States v. Pitre,
   960 F.2d 1112 (2d Cir. 1992)................................................... 13, 14

United States v. Polizzi,
   801 F.2d 1543 (9th Cir. 1986) ......................................................... 23

iv

United States v. Preldakaj,
  456 F. App'x 56 (2d Cir. 2012) ........................................................... 46
United States v. Price,
  443 F. App'x 576 (2d Cir. 2011) ......................................................... 27
United States v. Rahme,
  813 F.2d 31 (2d Cir. 1987) ................................................................... 36
United States v. Reese,
  933 F. Supp. 2d 579 (S.D.N.Y. 2013) ............................................... 47
United States v. Regan,
  103 F.3d 1072 (2d Cir. 1997) ............................................................... 47
United States v. Rivera,
  22 F.3d 430 (2d Cir. 1994) ................................................................... 36
United States v. Robinson,
  702 F.3d 22 (2d Cir. 2012) ................................................................... 31
United States v. Roldan-Zapata,
  916 F.2d 795 (2d Cir. 1990) ........................................................ *passim*
United States v. Romanello,
  No. 22-CR-194 (EK), 2023 WL 8435993 (E.D.N.Y. Dec. 4, 2023) .................... 26
United States v. Rosa,
  11 F.3d 315 (2d Cir. 1993) ............................................................. 15, 31
United States v. Rosado,
  728 F.2d 89 (2d Cir. 1984) ................................................................... 46
United States v. Rosemond,
  958 F.3d 111 (2d Cir. 2020) ........................................................ *passim*
United States v. Russo,
  302 F.3d 37 (2d Cir. 2002) ............................................................. 35, 36
United States v. Saget,
  377 F.3d 223 (2d Cir. 2004) ................................................................. 37
United States v. Saldarriaga,
  204 F.3d 50 (2d Cir. 2000) ............................................................. 46, 47
United States v. Schlesinger,
  372 F. Supp. 711 (E.D.N.Y. 2005) ...................................................... 37
United States v. Sears,
  544 F.2d 585 (2d Cir. 1976) ................................................................. 22
United States v. Smith,
  918 F.2d 1501 (11th Cir. 1990) ........................................................... 27
United States v. Smothers,
  No. 20-CR-213 (KAM), 2023 WL 348870 (E.D.N.Y. Jan. 20, 2023) .................... 12
United States v. Stewart,
  433 F.3d 273 (2d Cir. 2006) ................................................................. 37
United States v. Stewart,
  No. 03-CR-717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) .................... 47
United States v. Tellier,
  83 F.3d 578 (2d Cir. 1996) ................................................................... 36
United States v. Thai,
  29 F.3d 785 (2d Cir. 1994) ................................................................... 12

United States v. Towne,
   870 F.2d 880 (2d Cir. 1989)................................................................... 12
United States v. White,
   312 F. Supp. 3d 355 (E.D.N.Y. 2018) ................................................... 41
United States v. Williams,
   205 F.3d 23 (2d Cir. 2000)........................................................... 15, 31
United States v. Williams,
   739 F.2d 297 (7th Cir. 1984) ................................................................ 27
United States v. Williams,
   930 F.3d 44 (2d Cir. 2019)........................................................... 26, 32
United States v. Zackson,
   12 F.3d 1178 (2d Cir. 1993)................................................................. 19

Statutes

18 U.S.C. § 891.................................................................................... *passim*

Rules

Fed. R. Evid. 403 ................................................................................... 28
Fed. R. Evid. 404(b)......................................................................... 12, 14
Fed. R. Evid. 405(a) ............................................................................... 23
Fed. R. Evid. 609 ....................................................................... 41, 43, 45
Fed. R. Evid. 801(c)............................................................................... 34
Fed. R. Evid. 801(d) ......................................................................... 35, 36
Fed. R. Evid. 802 ................................................................................... 34
Fed. R. Evid. 803(21)...................................................................... 23, 24

## PRELIMINARY STATEMENT

Defendant John Ragano is charged with extortionate collection of credit and conspiracy to commit the same, harassment of a witness and witness tampering in connection with a $150,000 loan he issued to an individual ("John Doe") in 2021 and sought to collect through extortionate means.  Trial is scheduled to begin on October 7, 2024.  The government respectfully moves in limine to admit (1) evidence that is directly relevant to the charged crimes, including with respect to the 2021 loan and Ragano's guilty plea to that loan, Ragano's membership in organized crime and his involvement in a marijuana trafficking scheme, (2) statements by a co-conspirator, and (3) evidence of Ragano's prior convictions, should he choose to testify.  The government also moves to preclude improper evidence or argument challenging the government's investigatory conduct or prosecution.  Each category of evidence and the bases for the government's motions are described in detail below.  For the reasons set forth herein, the government's motions in limine should be granted in their entirety.

## RELEVANT BACKGROUND[1]

On February 2, 2024, a grand jury sitting in the Eastern District of New York returned an indictment (the "Indictment"), charging Ragano with extortionate collection of credit conspiracy between November 2022 and July 2023, in violation of Title 18, United States Code, Section 894(a)(1) (Count One); extortionate collection of credit between November 2022 and July 2023, in violation of Title 18, United States Code, Section 894(a)(1) (Count Two); harassment of

---

[1]    The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce at trial.  In addition, the proffer of facts set forth in this motion as to any witness's anticipated testimony is a collection of the sum and substance of the witness's anticipated testimony and does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce through the respective witness's anticipated testimony.

a witness between November 2022 and July 2023, in violation of Title 18, United States Code, Section 1512(d)(2) (Count Three); and witness tampering on or about July 5, 2023, in violation of Title 18, United States Code, Section 1512(b)(3) (Count Four).  ECF Dkt. No. 1.  Through witness testimony and other evidence, the government will establish the following facts at trial.

I.       Ragano's Extortionate Loan to John Doe in 2021

John Doe is expected to testify that in 2020, he had met Ragano at a social event through Vincent Ricciardo, a captain in the Colombo organized crime family of La Cosa Nostra ("LCN").  Other individuals at the event told John Doe that Ragano was a member of the Bonanno organized crime family of LCN (the "Bonanno crime family") and had used violence against others in the past.  John Doe later looked up Ragano on the Internet and found information online about Ragano's membership and association with the Bonanno crime family and past violent criminal acts.

In early 2021, John Doe borrowed a total of $150,000 from Ragano (the "2021 Loan").  John Doe made weekly interest payments to Ragano for approximately $1,800 a week.  These payments did not reduce the principle of the loan.  Another individual (the "Individual-1[2]") helped Ragano collect payments from John Doe toward the 2021 Loan.  Ragano and Individual-1 discussed the terms of the loan and the fact that Ragano stood to make approximately $100,000 in interest alone in fourteen months.  ██████████████████████████████████████████████

John Doe and ████████ are expected to testify that, based on statements Ragano made to them and their own observations, Ragano was quick to anger and spoke often about his willingness to use violence against others to accomplish his goals.  ██████████████████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

█████████████████████████████████████████

██████████████ ohn Doe and ██████ are also expected to testify that they knew Ragano by his nickname "Maniac," and that they understood this nickname to be a reference to Ragano's willingness to use violence and his tendency to lose his temper.[3]

II.    Ragano's Involvement in Marijuana Trafficking

In 2021, Ragano, along with John Doe, Individual-1, and others, began discussing a scheme to traffic large quantities of marijuana from New York to Florida by vehicle.  The scheme included a plan to purchase samples of marijuana to determine which sample to later obtain in larger quantities; in June 2021, Ragano picked up one-pound samples of two different types of marijuana from John Doe and another individual.  Ragano and others then began contacting potential buyers in New York to secure commitments to purchase larger quantities of marijuana.

During their discussions about the plan to distribute marijuana, Ragano told John Doe ██████████ about his status as a "made," or inducted, member of the Bonanno crime family.  Ragano also made statements to John Doe ██████████ about his willingness to break the law and use violence.  For example, Ragano talked about being a "gangster," about his willingness to commit acts of violence as a means of resolving business and personal disputes, and about a prior violent attack he committed to further his business dealings.  Several of these statements were recorded ██████████ and the government seeks to introduce some of Ragano's recorded statements (in addition to testimony ██████████, including:

- On or about April 19, 2021, Ragano discussed retaliating against a woman by slashing the tires of several vehicles.  He indicated that he also threw a garbage can at the woman's vehicle.  He stated, "If I gotta go back to jail, I'll go back

███████████████████████████████████████████████

to jail." Later in the conversation, in reference to the woman and her property, he stated, "I'm going to burn everything, and there ain't no camera."

- On or about April 27, 2021, Ragano stated, "I know my life, I live in the street, I can go to jail any day. If I go to jail now and I'm with her, I'm done. Listen to what I'm telling you, if I go to jail five years from now, my friends will be there until the day I die. And I never know when I'm gonna go to jail."

- On or about June 1, 2021, Ragano recounted ███████████ statements that Ragano had made to John Doe, in which he (Ragano) had explained that he could betray his conspirators in the marijuana scheme, by refusing to share any proceeds or directing his associates to rob John Doe and others. He stated, he could "send two guys in to rob them, I mean this is not something new to me. What do you guys think I was born yesterday? Are you fucking kidding me? I got guys that could go rob the farmer if I wanted to. I hang out with gangsters in fucking jail, guys that did time, 25 years, that are hung up for money and would do anything. You guys are playing games, this is games youse are playing, youse don't want to make money."

- On or about June 2, 2021, Ragano expressed his frustrations with the progress of the marijuana distribution scheme. Ragano stated, "What am I a fucking jerk off? I'm in the street all day hustling my ass off. I'm the only fucking gangster around here that'll go to jail, stop jerking me off man, you gave me the shit for 600, I can go sell it for 1,000, I'll be in the street a gangster, like a n****, you're giving it to me for the same price the n**** are paying, you ain't doing nothing for me!"

- On or about June 2, 2021, Ragano also stated, "I'm gonna tell you a little story guys, I used to sell mescaline, I beat a guy with a baseball bat . . . I ended up giving the guy a beating because the guy was a dope and went two weeks and tried it again. I beat the guy with a full bottle of fucking Heineken, not Heineken, Colt .45, I cracked him like seven times on top of his head, so don't think these people won't try anything."

III.   <u>Ragano's Arrest in September 2021, Initial Pretrial Detention and Pretrial Supervision</u>

On September 14, 2021, Ragano was arrested in connection with the extortionate loan to John Doe, the scheme to traffic marijuana and fraud in connection with Office of Safety and Health Administration ("OSHA") identification documents in a case captioned <u>United States v. Alimena et al.</u>, 21-CR-466 (HG) (E.D.N.Y.) ("<u>Alimena</u>"). ███████████████████

███████████████████████████████████████████

██████ Ragano were detained in a holding cell awaiting arraignment before a United States magistrate judge in the Eastern District of New York.  Ragano stated that he had been in a holding cell many times before, did not fear going to prison and had used violence against inmates who challenged him.  He added specifically that he never waited in line to use the prison's communal microwave.  Ragano then instructed those sitting on the cell's bench to move and lay on the bench and took a nap.  Ragano was ordered detained at the Metropolitan Detention Center ("MDC") in Brooklyn pending trial.

On December 17, 2021, Ragano was released from the MDC to pretrial supervision, over the government's objections, on a $1.5 million bond secured by Ragano and three sureties.  See Alimena, ECF Dkt. No. 176.  Among other conditions, Ragano was confined to home detention, his approved travel was restricted to New York City and Long Island and he was ordered to have no contact with co-defendants except in the presence of counsel, or with suspected members of organized crime or other witnesses in the case.  The court also ordered that Ragano be subject to GPS- and cyber- monitoring by the United States Pretrial Services Agency ("Pretrial Services").  Ragano was directed not to violate any federal, state or local laws.

During the course of Ragano's pretrial supervision, as described more fully below, he continued to try to collect the 2021 Loan from John Doe.  Although Ragano's pretrial conditions prohibited him from contacting John Doe, Ragano did so anyway, primarily through another individual ("Co-Conspirator #1") who contacted and collected payments from John Doe on Ragano's behalf.  Ragano and Co-Conspirator #1 were in regular contact during his pretrial supervision by phone and discussed, among other thing, online sports gambling through which Ragano placed regular wagers on various professional sports teams.

IV.    Ragano's Conviction and Sentence for the 2021 Loan

On November 28, 2022, Ragano pleaded guilty in Alimena to conspiracy to commit extortionate collection of credit in connection with his loan to John Doe.[4]  At his plea hearing, under oath, Ragano stated that he was guilty of the charged conspiracy to commit extortionate collection of credit, that his guilty plea was voluntary and that no one threatened or forced him to plead guilty or made any promises to him outside those in the plea agreement.  See Tr. of Plea Hearing at 20-21, Alimena, 21-CR-466 (HG) (Nov. 28, 2022).  Ragano made the following statements to the Court under oath:

| | |
|---|---|
| RAGANO: | I lent the victim money and I charged him more than I supposed to per week, and that was pretty much it. |
| COURT: | And where did this occur? |
| RAGANO: | In Long Island. |
| COURT: | Which county? Do you remember? |
| RAGANO: | Nassau. |
| COURT: | And what was the amount that you lent? |
| RAGANO: | 150,000. |
| COURT: | And do you recall what interest rate you were charging? |
| RAGANO: | I don't remember the rate. I know it was like $1,800 a week. |
| COURT: | And that was just interest or is that a payoff of principle? |
| RAGANO: | Well, that was pay off and interest, I guess. |
| THE COURT: | All right. Ms. Lash, what other elements would the Government be able to satisfy or need stipulation on? |
| . . . . | |
| MS. LASH: | Your Honor, the Government would show at any trial or Fatico hearing that extortionate means were used such as implicit threats, as well as knowledge of Mr. Ragano's prior conviction for extortionate collection of credit in the weekly collection of interest. We would also show that this happened – I'm sorry, Mr. Ragano stated Nassau County. |
| THE COURT: | Mr. Stein, do you have any issues with the additional facts that the Government would be able to establish and is your client prepared to stipulate to those as well? |
| MR. STEIN: | Yes, no issue, and yes. |

---

[4]    Ragano also pleaded guilty to conspiracy to commit fraud in connection with means of identification.

THE COURT:          And do you agree with that, Mr. Ragano?
RAGANO:             Yes, Your Honor.

Tr. of Plea Hearing at 24-26.

On April 11, 2023, Ragano was sentenced to 57 months' incarceration on each count, to be served concurrently. He self-surrendered to serve his sentence on July 10, 2023.

V.      Ragano's Continued Efforts to Collect Payments on the 2021 Loan

In 2022 and 2023, despite Ragano's arrest, court supervision, guilty plea and sentence, Ragano continued to extort John Doe to make payments on the 2021 Loan. Ragano's efforts to collect began after he was released from pretrial detention at the MDC in December 2021. In 2022, Ragano ███████████ attended several status conferences at the Eastern District of New York federal courthouse, specifically on March 4, 2022, May 20, 2022, August 15, 2022, and November 15, 2022. See Alimena, 21-CR-466 (HG), ECF Dkt. Nos. 250 (March 4, 2022), 315 (May 20, 2022); 345 (August 15, 2022); 380 (November 15, 2022). In connection with at least three of these status conferences, Ragano demanded that John Doe make payments to him by providing payments to Co-Conspirator #1.



In the fall/winter months of 2022, Co-Conspirator #1 contacted John Doe. Co-

Conspirator #1 told John Doe that he would collect payments for Ragano and cautioned John Doe not to "mess" with Ragano.  While John Doe replied to Co-Conspirator #1's messages, he did not make the payments to Co-Conspirator #1 that Ragano had directed him to.

In early January 2023, Ragano himself called John Doe from Co-Conspirator #1's phone and left John Doe a voicemail.   In the voicemail, Ragano said:   "What's going on [nickname]?  Happy New Year, Happy New Year, I haven't heard from you.  What's the story? How you making out?  Gimme a call.  Bye."  John Doe understood Ragano to be directing him to make a payment.

On March 25, 2023, John Doe met with Co-Conspirator #1, which John Doe consensually recorded.  At this meeting, Co-Conspirator #1 explained that Ragano wanted John Doe to repay the entire amount of the loan.  Co-Conspirator #1 explained that "nobody's looking for anybody to get hurt."

| | |
|---|---|
| CC#1: | Well, he was hoping you came up with everything. |
| John Doe: | Right. |
| CC #1: | Whatever it was you owed him. |
| | . . . |
| CC#1: | Yea, listen, at the end of the day, he just wants all this to go away, so- |
| John Doe: | Right, right, yeah. |
| CC#1: | So, that's it, there's no, nobody's looking for, nobody's looking for anybody to get hurt, nobody's looking to hurt your pocket or hurt his pocket, just- |
| John Doe: | Yeah. |

John Doe understood these statements to be threats of violence, and that if he did not repay the loan, he would be harmed.

On March 31, 2023, John Doe again met Co-Conspirator #1.   John Doe consensually recorded the meeting in which they again discussed the loan.  During the meeting,

8

John Doe gave $1,000 to Co-Conspirator #1 for Ragano.  Despite the payment, Co-Conspirator #1 told John Doe that Ragano was "a little upset" that the loan was outstanding:

| | |
|---|---|
| CC#1: | Listen, at the end of the day, he was a little upset that, you know, you was going on it for a while- |
| John Doe: | Right, right, right. |
| CC#1: | But that was, shit happens, so he's gonna be happy that everything's back on point and, it's good to know then to not know. |
| John Doe: | Yeah, yeah, all right. |

On April 15, 2023, John Doe paid another $1,000 to Ragano (via Co-Conspirator #1).  At this meeting, which John Doe consensually recorded, Co-Conspirator #1 called Ragano and put him on speaker phone so that Ragano and John Doe could speak briefly.  Before the call, Co-Conspirator #1 explained that Ragano's phone was a "fed phone," i.e., that the phone was monitored by Pretrial Services.  Co-Conspirator #1 cautioned John Doe not to say John Doe's name over the "fed phone."  During the call, Ragano and John Doe exchanged pleasantries, and Ragano ended the conversation stating, "All right thank you, thank you, be good, I appreciate it."

On April 27, 2023, John Doe met Co-Conspirator #1 and paid $1,000 to Ragano.  Two days later, on April 29, 2023, Co-Conspirator #1 met Ragano and the two called John Doe from Co-Conspirator #1's phone via Facetime so as to avoid detection on Ragano's "fed phone."  During the call, which John Doe consensually recorded, Ragano encouraged John Doe to make money at work, stating, "and you can take care of me," in reference to the loan.

In June 2023, Co-Conspirator #1 sent multiple messages and placed calls to John Doe to arrange for additional payments for Ragano.  In response to this outreach, John Doe told Co-Conspirator #1 that he (John Doe) needed to discuss "an issue" with the loan with Ragano in person.  During a June 30, 2023 meeting, Co-Conspirator #1 said Ragano agreed to meet with John Doe at Ragano's workplace.  In a conversation, which John Doe consensually recorded, Co-

Conspirator #1 explained, "You can meet him [Ragano] right now, go, or whenever you want, go to his job, <u>he told me to tell you that</u>. [Intersection of Ragano's workplace], right there, that's the spot." Co-Conspirator #1 explained Ragano worked Monday through Saturday, and John Doe could go there, "any Monday to Saturday." John Doe asked if Ragano needed to know the specific date, and Co-Conspirator #1 replied, "No, just whenever, he told me to let you know, that's the address, go there, you don't gotta let me know."

On July 5, 2023, John Doe went to Ragano's workplace to discuss the loan. John Doe, who consensually recorded the meeting, told Ragano he was going to stop repaying the loan ("I gotta end this thing."). John Doe explained that he wouldn't continue paying because John Doe believed Ragano was cooperating with the government (an accusation which Ragano vehemently denied). Ragano then accused John Doe of cooperating with the government and demanded John Doe remove all his clothes (Ragano: "Okay, well then take off your fucking shit right now my man. Take off your fucking pants right now, lemme see, I want to see."). At Ragano's insistence, John Doe took off his clothing. At that point, two men at Ragano's workplace walked up behind Ragano; one man was holding metal tools. Ragano then told John Doe that John Doe should pay the money Ragano believed he was owed.

| | |
|---|---|
| Ragano: | You owe me my fucking money, let's see how you're gonna do when I get out. |
| John Doe: | Okay. |
| Ragano: | You want to duck me right now? Fine, that's what I want to know. |
| John Doe: | I'm not ducking you, I'm here, I'm here. |
| Ragano: | So if I fucking slap the shit out of you, you're gonna tell on me? |
| John Doe: | No. |
| Ragano: | I try to make this like a friendly thing- |
| John Doe: | [UI] |
| Ragano: | I said you give me my fucking money and we'll call it even. |

Ragano made explicitly clear that John Doe owed Ragano his "fucking money," and if John Doe did not pay, Ragano would harm him when Ragano was released from prison ("let's see how you're gonna do when I get out.").  Ragano also asked whether John Doe intended to stop making payments ("you want to duck me?") and explained what would happen if John Doe stopped making payments — Ragano would "slap the shit out of" John Doe.  The encounter ended with Ragano promising that he would see John Doe when Ragano got out of prison, and reminding John Doe that Ragano knew where John Doe lived.

| | |
|---|---|
| Ragano: | You fucking scumbag. |
| John Doe: | Okay. |
| Ragano: | I'll see you when I get out tough guy. |
| John Doe: | Okay. |
| Ragano: | I'll see you when I get out. |
| John Doe: | All right. |
| Ragano: | Don't forget I know where you're at now. |

## ARGUMENT

I.   Evidence Related to the 2021 Loan and Ragano's Ties to Organized Crime and Reputation Is Admissible

At trial, the government seeks to admit evidence related to the following:

(1) The 2021 Loan and Ragano's guilty plea to extortionate collection of credit conspiracy in connection with that loan;

(2) Ragano's conditions of and conduct during pretrial supervision;

(3) Ragano's reputation as a member of organized crime and his nickname "Maniac;"

(4) Evidence related to the 2021 marijuana scheme involving Ragano, John Doe and others; and

(5) Ragano's statements to John Doe following the September 14, 2021 arrest.

The evidence the government seeks to introduce will constitute either direct evidence of the charged crimes or evidence that is inextricably intertwined with such evidence and thus necessary to complete the story of the charged offenses and to explain the relationships among the defendant,

Co-Conspirator #1 and the government's witnesses.  Alternatively, the proffered evidence should

be admitted under Federal Rule of Evidence 404(b) to show knowledge, intent, motive, and plan,

among other permitted reasons.

        A.      Applicable Law

            1.      Direct Evidence

        The test for admissibility of so-called "other acts" evidence, especially in the

context of a charged conspiracy, does not begin with Rule 404(b): "[a]n act that is alleged to have

been done in furtherance of the alleged conspiracy [] is not an 'other' act within the meaning of

Rule 404(b); rather, it is part of the very act charged."  United States v. Concepcion, 983 F.2d 369,

392 (2d Cir. 1992); see also United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994); United States

v. Smothers, No. 20-CR-213 (KAM), 2023 WL 348870, at *2 (E.D.N.Y. Jan. 20, 2023).  When,

as in this case, "the indictment contains a conspiracy charge, 'uncharged acts may be admissible

as direct evidence of the conspiracy itself.'"  United States v. Miller, 116 F.3d 641, 682 (2d Cir.

1997) (quoting Thai, 29 F.3d at 812).

        Further, it is equally well settled that "'evidence of uncharged criminal activity is

not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same

transaction or series of transactions as the charged offense, if it is inextricably intertwined with the

evidence regarding the charged offense, or if it is necessary to complete the story of the crime on

trial.'"  United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting United States v.

Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)); see also United States v. Towne, 870 F.2d 880, 886

(2d Cir. 1989) (same).  The Second Circuit has repeatedly upheld the admission of uncharged act

evidence as direct evidence of the charged crimes where such evidence provides necessary

background or context for the charged crimes.  See Gonzalez, 110 F.3d at 941-42 (uncharged

burglary admissible in trial for felon in possession of a firearm because, inter alia, it provided

"crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" of defendants' arrest); United States v. Diaz, 176 F.3d 52, 80 (2d Cir. 1999) (evidence of uncharged acts admitted to show "how illegal relationships and mutual trust developed" between individuals); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed.").  In this respect, "trial court[s] may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."  United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988)).

For example, under this "well-established case authority," the district court in United States v. Graziano, 558 F. Supp. 2d 304, 319 (E.D.N.Y. 2008), admitted defendants' prior threats to the victims, an unsuccessful attempt to have them assaulted and other interactions between them, in a case charging arson of the victims' restaurant.  The district court explained: "[I]f the jury were only allowed to consider the evidence of the arson in isolation, without reference to prior alleged escalating threats and actions towards the [victims], the jury may be unable to understand why an individual would resort to such a drastic and violent criminal act as arson to deal with his alleged dispute with the owners."  Id. (reasoning a jury "cannot be expected to make

13

its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge" and citing United States v. Moore, 735 F.2d 289, 292 (8th Cir. 1984)).

As to the timing of the acts, the law does not require that the only evidence of a conspiracy or other crime be from the charged period of the conspiracy or other crime. See, e.g., Lutwak v. United States, 344 U.S. 604, 617 (1953) (defendants' post-conspiracy acts admissible to help show existence of immigration scheme); United States v. Mendez, 165 F.3d 15, 1998 WL 802127, at *1 (2d Cir. 1998) ("Evidence of post[-]conspiracy conduct is admissible where, as here, it had real probative value regarding [the defendants'] willingness and intent to enter into the proven conspiracy." (internal quotation marks omitted)). Similarly, uncharged conduct may be admissible even if it occurred prior to the charged conspiracy if it allows the jury to understand the origin of the defendants' participation in the charged conspiracy, as well as relationships between the co-conspirators. See United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history.").

2.    Rule 404(b)

In the alternative, evidence of uncharged crimes or "other acts" may also be admitted pursuant to Federal Rule of Evidence 404(b) for permissible purposes, including to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. See Fed. R. Evid. 404(b)(2); see also United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988).

The Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application, and applies an "inclusionary or positive approach" to admitting evidence of "other acts." See United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002) (citing Pitre, 960 F.2d

14

at 1118); <u>see also</u> <u>United States v. Levy</u>, 731 F.2d 997, 1002 (2d Cir. 1984) ("We have adopted the inclusionary or positive approach to [404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").   A party must satisfy three requirements for evidence of "other crimes, wrongs or acts" to be admitted under the rule.   <u>First</u>, the evidence must be offered for a purpose other than to prove a defendant's bad character or criminal propensity.   <u>United States v. Mickens</u>, 926 F.2d 1323, 1328 (2d Cir. 1991); <u>United States v. Colon</u>, 880 F.2d 650, 656 (2d Cir. 1989).   <u>Second</u>, the evidence must be relevant under Rules 401 and 402 and not run afoul of Rule 403 of the Federal Rules of Evidence.   <u>See</u> <u>Mickens</u>, 926 F.2d at 1328; <u>Ortiz</u>, 857 F.2d at 903; <u>Levy</u>, 731 F.2d at 1002.   <u>Third</u>, if the defendant requests that the jury be instructed as to the limited purpose for which the government's evidence is being admitted, the court must furnish such an instruction.   <u>See</u> <u>Mickens</u>, 926 F.2d at 1328-29; <u>Levy</u>, 731 F.2d at 1002.

The Second Circuit repeatedly has held that evidence of uncharged crimes may be admitted at trial to establish the existence and development of a criminal relationship between co-conspirators.   <u>See</u>, <u>e.g.</u>, <u>United States v. Williams</u>, 205 F.3d 23, 33-34 (2d Cir. 2000) (upholding admission of evidence relating to the defendant's prior criminal activities with co-conspirators in charged drug conspiracy as relevant evidence to inform jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed); <u>United States v. Pipola</u>, 83 F.3d 556, 565-66 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case."); <u>United States v. Rosa</u>, 11 F.3d 315, 333-34 (2d Cir. 1993) (holding that co-defendants' relationship over a 14-year period, during which stolen property and narcotics crimes were committed, "was properly admitted to explain how the illegal relationship

between the two [defendants] developed and to explain why [one defendant] . . . appointed [the other defendant] to a leading position in the Organization"); United States v. Harris, 733 F.2d 994, 1006-07 (2d Cir. 1984) (upholding admission of evidence of defendant's previous narcotics transactions with informant who posed as prospective narcotics customer in connection with charged conspiracy, even though informant was not a member of the charged conspiracy, because the evidence "tended to show the basis for Harris's trust of [the informant]").

In addition, to the extent that evidence of an uncharged crime is offered to prove knowledge or intent (i.e., state of mind), the law requires that the other act and the charged conduct be "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge [or intent] inference advocated by the proponent of the evidence," else it would not be relevant.  United States v. Aminy, 15 F.3d 258, 260 (2d Cir. 1994) (quoting United States v. Peterson, 808 F.2d 969, 974 (2d Cir. 1987) (internal quotation marks omitted)); see also United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006) (prior arrest for small amount of cocaine base street-level distribution sufficiently similar to prove knowledge and intent for charged crime of possession of large amount of powder cocaine in residence); United States v. Araujo, 79 F.3d 7, 8 (2d Cir. 1996) (explaining similarity rule for knowledge and intent proof is "simply a rule of relevance").

Finally, additional bases for admitting other acts evidence under Rule 404(b) include "corroborat[ing] crucial prosecution testimony" if the corroboration is "direct and the matter corroborated is significant," United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (internal quotation marks omitted), and, where cross-examination into a government witness's bad acts for impeachment purposes is anticipated, allowing the government to elicit the witness's testimony about such acts on direct examination so as to avoid the appearance that the government

16

is concealing such purported impeachment evidence from the jury, see, e.g., United States v. Guerrero, 882 F. Supp. 2d 463, 493 (S.D.N.Y. 2011).

     B.     The Related Evidence is Admissible

     1.     The 2021 Loan and Ragano's Guilty Plea to the 2021 Loan

The government seeks to offer evidence, including testimony, consensually recorded statements and documentary evidence, concerning Ragano's 2021 Loan to John Doe. The government also intends to introduce evidence of the defendant's guilty plea in Alimena in connection with the 2021 Loan. This is direct evidence of all four charges in the Indictment. The evidence both completes the story of and provides essential background for Ragano's continued extortionate collections from John Doe. It is also highly probative of Ragano's consciousness of guilt in the charged case. Alternatively, evidence concerning the 2021 Loan is also admissible under Rule 404(b).

First, evidence concerning the 2021 Loan is admissible because it arose from the same transaction as the charged conduct. For Counts One and Two, the government must show at trial that in 2022 and 2023, Ragano collected or attempted to collect payments from John Doe, used extortionate means to do so, and did so knowingly. See 18 U.S.C. § 894(a); see also United States v. Romanello, 22-CR-194 (EK), ECF 114 at 27-28 (December 4, 2023) (listing elements for extortionate collection of credit). Evidence as to the origin of the loan and its terms demonstrates that in 2021, Ragano extended credit to John Doe and that he collected payments from John Doe. The fact that Ragano issued the 2021 loan to John Doe and previously collected payments on that loan is directly relevant to prove Ragano's collections and attempted collections in 2022 and 2023. Moreover, evidence concerning the extortionate means used to collect the loan in 2021 is also directly relevant to the extortionate means used to collect the loan in 2022 and 2023. Put differently, if Ragano and John Doe understood in 2021 that Ragano would enforce John Doe's

timely payments with violence or the threat of violence, that prior understanding is inextricably intertwined with Ragano's demands for payment a year later.

Ragano's guilty plea to conspiring to collect the 2021 Loan in <u>Alimena</u> is also admissible as direct evidence of the charges in the Indictment.  Courts have held a defendant's prior guilty pleas can constitute direct and substantive evidence of the charged conduct.  <u>See, e.g.</u>, <u>United States v. Andreadis</u>, 366 F.2d 423, 433 (2d Cir. 1966) (upholding admission of prior guilty pleas at trial); <u>United States v. Frederick</u>, 702 F. Supp. 2d 32, 36 & n.5 (E.D.N.Y. 2009) (admitting prior guilty as "direct, substantive evidence of the charged conduct"); <u>United States v. Allen</u>, No. 15-CR-95 (AJN), 2018 WL 1889759 (S.D.N.Y. Apr. 17, 2018) (admitting prior guilty plea).  Ragano's guilty plea is admissible here as direct evidence.  His guilty plea demonstrates that Ragano extended the loan to John Doe in 2021, collected payments from him at high interest rates, and used implicit threats and his criminal reputation to ensure payments.  For the same reasons explained above, Ragano's understanding of the collections in 2021 is direct evidence of his understanding of the collections in 2022 and 2023.  This evidence not only bears directly on Ragano's knowledge of the loan and its terms, but also on Ragano's later demands for payment in 2022 and 2023 and how these demands would be received.

<u>Second</u>, the evidence concerning the 2021 Loan and Ragano's guilty plea provides essential background for the charges in the Indictment.  Indeed, courts in the Second Circuit routinely admit evidence where it bears on a relevant relationship between the defendant and another individual or where the evidence furthers a jury's understanding of how the crime came about and the defendant and others' role in it.  <u>See, e.g.</u>, <u>Graziano</u>, 558 F. Supp. 2d at 319–20 (admitting prior threats and attempts to assault the victims to "help[] the jury understand why the defendant allegedly decided to resort to" the charged crime of arson); <u>United States v. Pedroza</u>,

750 F.2d 187, 200-01 (2d Cir. 1984) (allowing evidence of defendant's participation in uncharged cocaine transaction to prove defendants had kidnapped the victim to recover seven kilograms of cocaine); United States v. Chan, No. 97-CR-1053 (PKL), 2002 WL 46994, at *3 (S.D.N.Y. Jan. 14, 2002) (evidence of defendant's gambling activity, namely acting as a bookie for some of the other coconspirators, his failed check fraud scheme, and his illegal firearm sale was admissible to prove the defendant's motive to become involved in the alleged narcotics trafficking); United States v. Pacheco, 902 F. Supp. 469, 474 (S.D.N.Y. 1995) (evidence of uncharged narcotics conspiracy admissible to prove reason for charged kidnapping); United States v. Frank, 11 F. Supp. 2d 314, 317 (S.D.N.Y. 1998) (evidence of defendant's prior narcotics dealings was highly probative of his state of mind and necessary to complete the story of the crimes charged). That is true here. Evidence concerning the loan and its terms between January and September 2021 explains the relationship between Ragano and John Doe, and more importantly, why Ragano would demand repayment for a loan that Ragano was charged and convicted of conspiring to collect. Accordingly, without this information, the jury would be "unable to understand the government's theory of the case." Frank, 11 F. Supp. 2d at 317 (quoting Pedroza, 750 F.2d at 201).

Third, Ragano's issuance and collection of the loan payments in 2021 and his guilty plea to conspiring to make extortionate collections of credit are highly probative of his consciousness of guilt. United States v. Nektalov, 325 F. Supp. 2d 367, 371 (S.D.N.Y. 2004) ("[w]here a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged." (quoting United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993))). The fact that Ragano pleaded guilty to knowingly collecting payments from a loan using

19

extortionate means, and then later continued to demand money to repay the same loan, is direct evidence of Ragano's state of mind.

In the alternative, to the extent the Court finds that the evidence described above constitutes "other acts" evidence under Rule 404(b), all of the evidence is admissible pursuant to that Rule for several permissible, non-propensity purposes, including to establish Ragano's motive, opportunity, intent, plan, knowledge, identity and absence of mistake or accident.  For the reasons set forth above, this evidence is highly probative of the charged crimes and is not substantially outweighed by any prejudicial effect because it is no more sensational or disturbing than the charges he faces.  See, e.g., United States v. Rosemond, 958 F.3d 111, 126 (2d Cir. 2020) (admitting conduct that "does not involve conduct any more sensational or disturbing than the crimes with which the defendant has been charged"); United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990).

2.      Pretrial Supervision

The government also seeks to offer evidence concerning Ragano's conditions of and conduct during his pretrial supervision in Alimena, including Ragano's prohibition against contacting John Doe, and Ragano's contact with John Doe and Co-Conspirator #1.  This is admissible as direct evidence of the charged crimes.

For one, evidence concerning his pretrial supervision is direct evidence of Ragano's harassment of a witness (count three) and witness tampering (count four).  As set forth in the Indictment, Ragano is charged in connection with his efforts to hinder, delay or prevent John Doe from reporting (a) Ragano's extortionate collection of credit and conspiracy to commit the same, and (b) Ragano's prohibited contact with John Doe in violation of the conditions of his pretrial release in Alimena.  ECF Dkt. No. 1.  Therefore, evidence that Ragano was prohibited from contacting John Doe is necessary to explain the charged crimes and the government's theory of

20

Ragano's criminal liability.

Furthermore, Ragano's contact with John Doe — despite his prohibition from doing so — and his use of Co-Conspirator #1 to contact John Doe on his behalf is direct evidence of Ragano's consciousness of guilt as to the extortionate collection of credit. Ragano was aware that he was prohibited from contacting John Doe and that his phone was monitored by court officers, so Ragano used his criminal associate as a go-between and only contacted John Doe from Co-Conspirator #1's phone. In addition, Ragano's covert attempts to collect payment from John Doe also show the true nature of these demands for payment — that they were unlawful. Accordingly, evidence concerning Ragano's conditions of and conduct during court supervision is direct evidence the charged crimes and of Ragano's state of mind.

3.    <u>Ragano's Reputation as a Member of Organized Crime and His Nickname "Maniac"</u>

The Court should permit the government to introduce evidence of Ragano's reputation in the community, namely his membership in the Bonanno crime family and his nickname "Maniac," which it will offer primarily through witness testimony. This evidence is directly relevant to the charged loansharking scheme as it demonstrates that Ragano's conduct toward John Doe was designed to instill fear.

In this case, Ragano's association with organized crime and his membership in the Bonanno crime family is inexorably intertwined with the loansharking crimes with which he is charged. Ragano's loan to John Doe was part and parcel to his organized crime activities: he learned of the loansharking opportunity through members of the Colombo crime family, and profits from John Doe's interest payments also went to other LCN members. Additionally, Ragano and Co-Conspirator #1 relied on Ragano's reputation in organized crime to make the extortionate collection demands from John Doe. Thus, the Court should permit the government to introduce

Ragano's recorded statements identifying himself as a "gangster" as direct evidence of the threats in this case, as well as evidence regarding John Doe's and Individual-1's belief that the defendant was associated with organized crime.  Further, if the government witnesses' credibility on this issue is a subject of impeachment during cross-examination or the defendant's association with organized crime is otherwise contested, the Court should further permit testimony on specific acts John Doe believed the defendant to have been involved in.  Such evidence is highly relevant to the defendant's state of mind and whether John Doe would reasonably have been placed in fear.

"Extortion" for the purposes of Title 18, United States Code, Section 894, "includes any act or statement which constitutes a threat if it instills fear in the person to whom [the threat is] directed or [is] reasonably calculated to do so in light of the surrounding circumstances." United States v. Pacione, 738 F.2d 567, 572 (2d Cir. 1984) (quoting United States v. Sears, 544 F.2d 585, 587 (2d Cir. 1976)) (modification omitted); see also United States v. Natale, 526 F. 2d 1160, 1168 (2d Cir. 1975) (government must prove the defendant "intended to take actions which reasonably would induce fear in an ordinary person"); United States v. Curcio, 310 F. Supp. 351, 357 (D. Conn. 1970); 18 U.S.C. § 891(7) (defining "[a]n extortionate means" as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.").  As the Second Circuit has observed, the rationale behind this broad definition of extortion under Sections 892 and 894 is best understood against the backdrop of Congress's efforts to combat organized crime.  Pacione, 738 F.2d at 570.  For example, as the Pacione court observed, due to the nature of organized crime families and organizations, "loan sharks connected with organized crime rarely used force, or even made explicit threats to do so, because they found it unnecessary.  A loan shark's victim knew all too well that if he did not pay, a likely result would be bodily harm to him or his family."  Id.

Accordingly, to evaluate whether conduct constitutes an extortionate threat, all of the surrounding circumstances must be considered. Significantly, "it is the conduct of the defendant, not the victim's individual state of mind, to which the thrust of the statute is directed." Natale, 526 F.2d at 1168; see also United States v. Polizzi, 801 F.2d 1543, 1548 (9th Cir. 1986) (observing that it is the defendant's actions, "not the mental state produced in the debtor" that is the focus for the jury). To that end, evidence of a defendant's reputation "may be used to show the state of mind of both the defendant and the victim." United States v. Dennis, 625 F.2d 782, 800 (8th Cir. 1980). As the Dennis court explained:

> If a man makes vaguely menacing statements, aware that he is commonly known as a violent man, then it is a reasonable inference that he intends to instill fear. . . . It is unlikely that the defendant is unaware of his own reputation for violence; reputation, by definition, reflects general knowledge in the community, and, if anyone is a member of the relevant community, it is the defendant himself.

Id. at 800 (quoting Goldstock & Coenen, Controlling the Contemporary Loanshark: The Law of Illicit Lending and the Problem of Witness Fear, 65 Cornell L. Rev. 127, 200-01 (1980)); see also Pacione, 738 F.2d at 572 (citing Dennis and Goldstock & Coenen).

Federal Rule of Evidence 405(a) provides that whenever a person's "character or character trait" is admissible, as it is in extortion cases like this, evidence may be offered in the form of opinion or reputation testimony. Fed. R. Evid. 405(a). Reputation evidence "rests on what people have heard about the behavior of a party," 2 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence § 4:42 Opinion and reputation evidence (4th ed.), and, as such, is admissible as an exception to the rule against hearsay, see Fed. R. Evid. 803(21) ("The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: . . . A reputation among a person's associates or in the community concerning the

23

person's character.").

As it pertains to reputation testimony, a "witness is . . . allowed to summarize what he has heard in the community, although much of it may have been said by persons less qualified to judge than himself."  Michelson v. United States, 335 U.S. 469, 477 (1948) (emphasis added).  "The evidence which the law permits is not as to the personality of defendant [sic] but only as to the shadow his daily life has cast in his neighborhood."  Id.  "Trustworthiness in reputation evidence is found when the topic is such that the facts are likely to have been inquired about and that persons having personal knowledge have disclosed facts which have thus been discussed in the community; and thus the community's conclusion, if any has been formed, is likely to be a trustworthy one."  Fed. R. Evid. 803(21) Advisory Committee's Note (internal citation omitted).

To be qualified to give an opinion on the defendant's reputation, the witness must "show[] such acquaintance with the defendant, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which he is generally regarded."  Michelson, 335 U.S. at 478.  However, "reputation evidence need not be drawn from a particular 'neighborhood' . . . and may come instead from the workplace, and from other social and organizational settings in which the person in question is better known."  2 Federal Evidence § 4:42.  Nor does reputation evidence need to have a specific level of particularity.  See United States v. Gigante, 729 F.2d 78, 83 (2d Cir. 1984) (permitting evidence that the debtor believed the loanshark was "connected to organized crime"); United States v. Fazio, 770 F.3d 160, 165 (2d Cir. 2014) (allowing evidence that Local 348 had a reputation in the community as a "mafia union").  As the Eight Circuit explained in Dennis:

> Reputation evidence is often used to help establish the victim's state of mind as proof of his fear and reasonableness thereof.  The state may establish the existence of reasonable fear by showing the victim's knowledge of the defendant's reputation for violent

24

character or underworld association at the time the crime was committed; it need not show, however, a specific reputation for violence in connection with extortionate schemes.

Dennis, 625 F.2d at 800.

In this case, as set forth above, the government seeks to admit evidence that Ragano was reputed to be affiliated with organized crime and, in particular, with the Bonanno crime family — a fact the government witnesses were aware of before Ragano provided the 2021 Loan and was later confirmed by Ragano himself in statements to those witnesses. Evidence of this reputation will be offered through the testimony of John Doe and Individual-1, each of whom worked closely with Ragano and was aware of his reputation in the community from others and (later) Ragano's own statements. Ragano's reputation as a member of the mafia is directly relevant to the charged extortion. It illuminates how both Ragano and John Doe reasonably understood Ragano's demands for payment — and the consequences of not making those payments. To be sure, Ragano was believed to be a member of a wide-reaching and violent criminal organization with numerous members and affiliates who can provide assistance as needed. The demands of a member of such a criminal organization can be reasonably be expected to induce fear in an ordinary person. Further, evidence of Ragano's association with LCN reveals his state of mind, including what he understood his threats to mean to John Doe given his own association.

Ragano's and Co-Conspirator #1's continued demands for repayment culminated in the recorded altercation between Ragano and John Doe on July 5, 2023 and must be understood against the backdrop of Ragano's reputation in the community as a violent member of organized crime. Ragano's statements on July 5, 2023 demonstrate that Ragano intended to instill fear in John Doe to ensure repayment of his debt and that a reasonable person would have experienced that fear. Accordingly, the evidence of Ragano's association with organized crime constitutes important evidence of the state of mind of both Ragano and John Doe. See Dennis, 625 F.2d at

800; Pacione, 738 F.2d at 572; United States v. Romanello, No. 22-CR-194 (EK), 2023 WL

8435993, at *1 (E.D.N.Y. Dec. 4, 2023) ("Here, the defendants' reputations for being 'wiseguys'

and having 'connections' to the Mafia are relevant to [the extortionate collection of credit

charges] . . . .  The reputation evidence in question sheds important light on the defendants' intent

— specifically, their intent to take action that would reasonably be expected to induce fear in an

ordinary person.  It also illuminates their knowledge of the likely effects of their words and

actions."); Gigante, 729 F.2d at 83 ("Evidence that the debtor believed the loanshark was

connected to organized crime is admissible to show the debtor's belief that the loanshark would

use, or had a reputation for using, extortionate means to collect extensions of credit."); see also

Fazio, 770 F.3d at 165 (noting, in the related context of extortion, that reputation evidence "goes

to the fear reasonably experienced by the victims"); United States v. Mulder, 273 F.3d 91, 103 (2d

Cir. 2001) (noting that "bad reputation" evidence "frequently conveys a tacit threat of violence");

United States v. Williams, 930 F.3d 44, 63 (2d Cir. 2019) ("[C]ourts routinely admit evidence of

gang membership . . . where the evidence is relevant for a proper purpose." (citing cases)).[5]

      Additionally, in testifying about Ragano's reputation as an organized crime

associate and Bonanno crime family member, it is expected that ███████ John Doe will

identify Ragano in part by his nickname, "Maniac."  The Court should permit these references.

The Second Circuit has ruled that "the [g]overnment may introduce evidence of a defendant's alias

---

[5]    To this same end, the government should be permitted to demonstrate Ragano's awareness of his reputation through evidence recovered from his mobile device, monitored by Pretrial Services following his arrest in Alimena.  That evidence includes:  (i) screenshots taken by him of articles and press releases discussing his arrest and alleged conduct in Alimena and of internet videos discussing the Bonanno crime family and other LCN topics; and (ii) internet searches by him for topics including "john ragano bonanno," "A Gangsters Gangster With Ties To The 'Goodfellas' Crew- The Story Of Bonanno Capo Vinny Asaro," "Who Were The Most Dangerous People In Mafia History?," and "Gangland."  See Dennis, 625 F.2d at 800 (discussing probative value of defendant's awareness of his own reputation).

or nickname if this evidence aids in the identification of the defendant or in some other way directly relates to the proof of the acts charged in the indictment." United States v. Mitchell, 328 F.3d 77, 83 (2d Cir. 2003) (quoting United States v. Williams, 739 F.2d 297, 299 (7th Cir. 1984) (internal quotation marks omitted)).

Indeed, even evidence of a nickname that is highly suggestive of crime can be admissible where it is relevant to the case and where the prosecution does not make excessive reference to the name.  Thus, in United States v. Price, the Second Circuit rejected a challenge based on prosecutors' references to the defendant's nickname "Crime": "Price concedes that 'the government did not overuse the nickname . . . during its opening or closing arguments.'  Even if witnesses frequently used the nickname, Price also concedes that all of the witnesses knew him as 'Crime,' and that occasional use would therefore have been permissible—thus inevitably revealing the nickname to the jury." United States v. Price, 443 F. App'x 576, 579 (2d Cir. 2011); see also United States v. Burton, 525 F.2d 17, 19 (2d Cir. 1975) (no prejudice where government referred to defendant's nickname, "Big Time," because the nickname "helped identify, as the defendant's voice, the male voice on two tape recordings of telephone conversations introduced by the government").  Other courts of appeal have agreed.  See, e.g., United States v. Delpit, 94 F.3d 1134, 1146 (8th Cir. 1996) (admission of evidence of nickname "Monster" was not erroneous because it was not used to "suggest [defendant's] bad character or unsavory proclivities" and could not be avoided in wiretaps); United States v. Black, 88 F.3d 678, 681 (8th Cir. 1996) (holding that reference to defendant as "the Jamaican" did not warrant reversal where name was not used in prejudicial manner and confidential informant knew defendant by that name); United States v. Smith, 918 F.2d 1501, 1511, 1513 (11th Cir. 1990) (affirming conviction where nickname was introduced as evidence defendant held a supervisory or managerial role in the enterprise whose

members called him "Boss Man").

Courts have limited the "repeated, gratuitous invocation" of a nickname that invites an inference of proclivity, see United States v. Farmer, 583 F.3d 131 (2d Cir. 2009), as when a prosecutor in a murder trial referred dozens of times in her jury addresses to the fact that the defendant's nickname was "Murder," although that was essentially an irrelevant and provocative fact, and was used by the prosecution to imply that the defendant must have acted consistently with his nickname by committing the charged crimes.  In Farmer, however, the Second Circuit indicated that mere suggestiveness does not require exclusion; rather, even suggestive nicknames can be admissible, particularly where the nickname is relevant and not invoked gratuitously.  See id. at 146 ("In [past] cases, the suggestiveness of the nickname has not required exclusion, especially when it helped to identify the defendant, connect him to the crime, or prove other relevant matter, or when coherent presentation of the evidence entailed passing reference to it."). In general, courts determining admissibility of evidence of a nickname must "consider[] whether the nickname's probative value [is] substantially outweighed by its capacity for unfair prejudice." Id.; see also Fed. R. Evid. 403.

As the Second Circuit has further observed, referencing Farmer:

[W]e have noted that if a "nickname [is] strongly 'suggestive of a criminal disposition,' and a propensity to commit particularly heinous crimes, including the very offenses charged in the indictment," then such a nickname might violate Rule 404(a).  [] But we have also explained that the "main problem" with the use of a potentially prejudicial nickname arises from "prosecutors' frequently repeated, gratuitous invocation of [the] nickname in . . . address[ing] . . . the jury, uttered in a context that, in effect, invite[s] the jurors to infer that the defendant . . . earned his nickname among his . . . colleagues as a result of his proclivity to commit" the charged crime.  [] Even then, the "misuse and overuse of [a] nickname" does not "lead us to vacate a conviction unless the defendant suffered 'substantial prejudice, by so infecting the trial with unfairness as to make the resulting conviction a denial of due

28

process.'"

United States v. Hill, 658 F. App'x 600, 604 (2d Cir. 2016) (internal citations omitted) (declining to find error in admission of trial testimony that the defendant was known by the nickname "gun man").

Here, evidence of Ragano's nickname will be offered to prove other relevant matters, including to identify Ragano, demonstrate his reputation in the community as a member of organized crime, and demonstrate his awareness of the effect that that reputation would have on John Doe.  His nickname is not directly suggestive of loansharking, harassment or witness tampering (the charges at issue here).  Witnesses' limited reference to this nickname will not show Ragano's proclivity to commit any particular crime, but rather be offered for the permissible purposes explained above.

Finally, the probative value of the Ragano's association with the Bonanno crime family and his nickname is not substantially outweighed by its prejudicial effect.  See, e.g., Rosemond, 958 F.3d at 126; Roldan-Zapata, 916 F.2d at 804.  Ragano is charged with making implicit or explicit threats to John Doe and relying on his reputation to ensure those threats were communicated; his membership in a criminal organization is highly probative to the jury's understanding of those threats and is no more prejudicial than the charged crimes.  In any event, any potential prejudice to the defendants can be effectively mitigated by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered. See, e.g., United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991).

    4.    <u>Evidence Related to the 2021 Marijuana Scheme Involving Ragano, John Doe and Others</u>

The government seeks to elicit evidence about the 2021 scheme to distribute

marijuana in New York and Florida that involved Ragano, John Doe and Individual-1.[6]  The evidence includes testimony from John Doe ███████████ concerning their involvement with Ragano in the scheme and Ragano's recorded statements about being a "gangster," about his willingness to commit acts of violence as a means of resolving business and personal disputes, and about a prior violent attack he committed to further his business interests, including the statements described above that were recorded on April 19, April 27, June 1, and June 2, 2021, respectively. The Court should permit the evidence about the marijuana distribution scheme because it is inextricably intertwined with the loansharking scheme.  Alternatively, it is also admissible under Rule 404(b).

First, the marijuana scheme occurred in the same time period as the extortionate loan and involved Ragano, John Doe, and Individual-1.  Therefore, it establishes that John Doe and Individual-1 knew and worked with Ragano and his associates, and allows the government to make the required showing that John Doe ███████████ ualified to provide testimony concerning Ragano's reputation and behavior.  See, e.g., Michelson, 335 U.S. at 478.

Second, the testimony about the marijuana scheme and Ragano's statements ██ ███████ rovide necessary context to the interactions among Ragano and the others, and the "background and history" of the charged loansharking conspiracy.  Langford, 990 F.2d at 70. Their involvement together in the marijuana scheme explains why Ragano would admit to John Doe ███████ his status as a "made," or inducted, member of the Bonanno crime family. It demonstrates that Ragano had repeatedly confided ███████████ bout Bonanno crime family

―――――――――――――――――

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

affaffairs ███████████████████████████ and it explains Ragano's reliance ████

██████████ to help collect payments from John Doe.  See, e.g., United States v. Pena, 978 F.

Supp. 2d 254, 262 (S.D.N.Y. 2013) (evidence of uncharged acts admissible as direct evidence

where they "establish the relationship between the defendants and cooperators").

  As discussed above, the Second Circuit has consistently held that evidence

pertaining to how members of a conspiracy met, committed crimes together and grew to trust each

other over time is relevant and admissible to explain relationships at issue.  As the Second Circuit

has explained: "One legitimate purpose for presenting evidence of extrinsic acts is to explain how

a criminal relationship developed; this sort of proof furnishes admissible background information

in a conspiracy case."  Pipola, 83 F.3d at 566; see also Williams, 205 F.3d at 33-34; United States

v. Pascarella, 84 F.3d 61, 72-73 (2d Cir. 1996); Araujo, 79 F.3d at 8; United States v. Alli-Balogun,

72 F.3d 9, 11-12 (2d Cir. 1995); United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993); United

States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990).  This rationale applies not only to

evidence of Ragano's relationship with Individual-1, but also to Ragano's relationship with John

Doe.  See, e.g., United States v. Robinson, 702 F.3d 22, 38 (2d Cir. 2012) (other conduct relevant

as direct evidence "because it addressed the nature of the relationship between [the defendant] and

[the victim]").

  Third, as described above, in the context of the marijuana scheme, Ragano made

several recorded statements ███████████ about being a "gangster," about his willingness to

commit acts of violence as a means of resolving business and personal disputes, and about a prior

violent attack he committed to further his business interests, including on April 19, April 27, June

1, and June 2, 2021, respectively.  See supra pp. 3-4.  Ragano's statements are admissible as non-

hearsay statements of a party opponent under Rule 801(d)(2)(A), and, in any event, would not be

offered for their truth but rather to show Ragano's state of mind and the effect of the statements on Individual-1. Such statements demonstrate Ragano's relationship with and trust of Individual-1, which is directly relevant in this case for the reasons discussed above. Such statements also demonstrate Ragano's intent to cause fear, and his knowledge and promotion of his reputation as an organized crime associate ready to resort to violence when he believed necessary. Ragano relied on that reputation in pressuring John Doe for repayment. ██████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████ _Williams_, 930 F.3d at 63 (finding admissible defendant's own statements that he was in a gang when used for a proper purpose).

      Even if the marijuana scheme were not intertwined with the offenses charged in the indictment (and it is), evidence of Ragano's involvement in the marijuana distribution scheme would be admissible under Rule 404(b) to establish his relationships with Individual-1 and John Doe, his motive, intent and plan in using intimidation and the threat of violence in his business dealings, and to establish absence of any mistake or accident in conveying implied threats to John Doe. Evidence of the marijuana scheme is relevant to the charged crimes and is not substantially outweighed by any prejudicial effect as it "does not involve conduct any more sensational or disturbing" than the instant crimes. _Rosemond_, 958 F.3d at 126; _Roldan-Zapata_, 916 F.2d at 804. Even Ragano's boasts ████████████ during the marijuana scheme are far less sensational than his direct in-person threats of violence to John Doe under circumstances strongly corroborative of

his intent to carry them out (including making the threats in a garage while flanked by men holding metal tools).

Additionally, John Doe's involvement in the marijuana scheme will likely be the subject of cross examination of John Doe by Ragano. Therefore, the government should be allowed to elicit testimony about such acts on direct examination so as to avoid the appearance that the government is concealing such purported impeachment evidence from the jury. See, e.g., Guerrero, 882 F. Supp. 2d at 492-93.

5.    The Circumstances Surrounding Ragano's September 14, 2021 Arrest

The government also seeks to offer ██████████████████ Ragano's behavior and statements in a holding cell following his September 2021 arrest, because it is inextricably intertwined with the charged crimes. Much like the other statements by Ragano that the government seeks to elicit, ██████████████████ Ragano's statements following his arrest—including that he had used violence as a means to get what he wanted—are admissible to show Ragano's state of mind and the reasonable effect on John Doe. Indeed, these statements provide the immediate backdrop for Ragano's continuation of the extortionate collection of credit scheme against John Doe—demonstrating how, even when in custody, and even when charged with a crime—Ragano resorted to violence and used his reputation for the same for even the most mundane requests, such as sitting on a bench. These statements demonstrate Ragano's intent to cause fear, and his knowledge and promotion of his reputation as a person ready to resort to violence when he believed necessary, including in the collection of John Doe's debt. Evidence demonstrating Ragano's state of mind, and effect on a reasonable victim, illustrates how he used extortionate means to continue collecting payments from John Doe.

Nor is this evidence unduly prejudicial. The government seeks to admit Ragano's charges and guilty plea as to the 2021 Loan, and his arrest on these charges is necessarily presumed

by his guilty plea.  Finally, these statements are highly probative — these remarks were the last ones communicated to John Doe before Ragano's demand for payment at their next interactions. Accordingly, they illuminate how John Doe's reasonable interpretation of these demands.

## II.  Statements By Co-Conspirator #1 Are Admissible

The government seeks to admit at trial statements made by Co-Conspirator #1 to John Doe during and in furtherance of the extortionate collection of credit conspiracy.[7]  As a practical matter, the government anticipates that the context in which certain statements are offered will make clear that the statements were in furtherance of the charged extortionate collection of credit.  These statements are admissible because they are direct evidence of the charged crimes, and they are not hearsay or they fall within an exception to the hearsay rule under the Federal Rules of Evidence.

### A.  Applicable Law

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court."  Fed. R. Evid. 802.

Not all out-of-court statements offered for their truth are hearsay.  Out-of-court statements made by the defendant are not hearsay when introduced by the government in a criminal

---

[7]  The government also anticipates introducing John Doe's statements to Co-Conspirator #1 and Ragano, in conversations which John Doe recorded in person or by telephone. These statements are admissible as they are probative of John Doe's state of mind at the time, see United States v. Detrich, 865 F.2d 17, 21 (2d Cir. 1988); United States v. Dunloy, 584 F.2d 6, 11 (2d Cir. 1978), and moreover, John Doe's statements are necessary context for the statements of Co-Conspirator #1 with whom he was communicating, see United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990); United States v. Davis, 890 F.2d 1373, 1380 (7th Cir. 1989).

trial to prove the truth of the facts stated therein because they are admissions of an adverse party. See Fed. R. Evid. 801(d)(2)(A); see United States v. Kone, 216 F. App'x 74, 76 (2d Cir. 2007) ("'Statements made by the defendant,' where relevant, 'may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party.'" (quoting United States v. Russo, 302 F.3d 37, 43 (2d Cir. 2002)).

Statements that are not being offered for their truth also are not hearsay.  For example, out-of-court statements made by a third party are not hearsay if offered as circumstantial evidence of the defendant's state of mind, rather than for their truth.  Detrich, 865 F.2d at 21; Dunloy, 584 F.2d at 11.  Similarly, questions or commands do not generally constitute hearsay. See United States v. Bellomo, 176 F.3d 580, 586-87 (2d Cir. 1999); United States v. Dominguez-Gabriel, 511 F. App'x 17, 20 (2d Cir. 2013); Quartararo v. Hanslmaier, 186 F.3d 91, 98 (2d Cir. 1999).  Finally, when a defendant makes statements in the context of a conversation with a third party, the statements of the third party are admissible non-hearsay to the extent that they are necessary to place the defendant's statements in proper context.  See Barone, 913 F.2d at 49; Davis, 890 F.2d at 1373.

Rule 801(d)(2)(E) also excludes from the definition of hearsay "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy."  A co-conspirator statement may be admitted by the government if the court finds by a preponderance of the evidence that (1) the conspiracy existed at the time the statement was made; (2) both the declarant and the defendant were part of the conspiracy; and (3) the statement was made in furtherance of the conspiracy.  Bourjaily v. United States, 483 U.S. 171 (1987); see also United States v. Gigante, 166 F.3d 75 (2d Cir. 1998).  While the hearsay statement itself may be considered in establishing the existence of the conspiracy, "there must be some independent corroborating evidence of the

defendant's participation in the conspiracy." Gigante, 166 F.3d at 82 (quoting United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)).

    With respect to the first and second requirements, the existence of a conspiracy and an individual's involvement in it are preliminary questions of fact to be resolved by the trial court. See In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93, 137 (2d Cir. 2008).  In making this determination, the Court must consider the statements in question, see Fed. R. Evid. 801(d)(2)(E), and other independent corroborating evidence of the defendant's participation in the conspiracy, see United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001); Fed. R. Evid. 801(d)(2)(E) (noting that the statement "does not by itself establish . . . the existence of the conspiracy or participation in it").

    As to the third "requirement that the challenged statement be 'in furtherance of' the conspiracy," it "is satisfied if the statement's objective is 'designed to promote or facilitate achievement of the goals of the conspiracy.'" United States v. Malka, 602 F. Supp. 3d 510, 535 (S.D.N.Y. 2022)  (quoting United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994)).  Courts in this district have repeatedly held that this standard is "is not very restrictive." United States v. Kurland, No. 20-CR-306 (S-1) (NGG), 2022 WL 2669897, at *3 (E.D.N.Y. July 11, 2022) (citing Malka, 602 F. Supp. 3d at 535)). "[S]tatements made during the course and in furtherance of a conspiracy must be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." Gigante, 166 F.3d at 82.  "This can include those statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." Id.; see also Russo, 302 F.3d at 46 (statements which "inform . . . [coconspirators] of the status of the conspiracy are in furtherance of the conspiracy within the meaning of 801(d)(2)(e)"); United

36

States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987) (statements "that apprise a co-conspirator of the progress of the conspiracy" are in furtherance of the conspiracy.).  Relatedly, the Second Circuit has held that a status update is sufficient to satisfy the "in furtherance" requirement of Rule 801(d)(2)(E).  United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994); see also United States v. Stewart, 433 F.3d 273, 293 (2d Cir. 2006) (holding that the statement need not actually further the conspiracy, but instead need only be made with the intent to further some objective of the conspiracy); see also United States v. Schlesinger, 372 F. Supp. 711, 720 (E.D.N.Y. 2005). Notably, "[a] statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy." Malka, 602 F. Supp. 3d at 535 (internal citations omitted).

Where co-conspirator statements are non-testimonial, there is no Confrontation Clause concern in the admission of co-conspirator statements.  See United States v. Saget, 377 F.3d 223, 228-30 (2d Cir.), supplemented, 108 F. App'x 667 (2d Cir. 2004) (analyzing Bourjaily, 483 U.S. 171, identifying as testimonial "a declarant's knowing responses to structured questioning in an investigative environment or in a courtroom setting where the declarant would reasonably expect that his or her responses might be used in later judicial proceedings.").

B.    Co-Conspirator #1's Statements Are Admissible

At trial, the government intends to introduce out-of-court statements made by Co-Conspirator #1 that are relevant evidence of the charges and do not constitute hearsay under the Federal Rules of Evidence.  The government intends to introduce recorded and unrecorded statements made by Co-Conspirator #1 to John Doe, including unrecorded statements in late 2022 and/or early 2023, and recorded statements on March 1, March 16, March 17, March 25, March

31, April 15, April 27, June 5, June 7, June 9, June 23, and June 30, 2023.[8]  The Court can and should preliminarily admit statements of Co-Conspirator #1 under Rule 801(d)(2)(E).

The evidence demonstrates that the first and second <u>Bourjaily</u> requirements are satisfied, showing that both Ragano and Co-Conspirator #1 were part of the conspiracy to make extortionate collections of credit from John Doe.  For one, the recorded statements demonstrate the existence of the conspiracy involving Ragano and Co-Conspirator #1.  On March 23 and June 30, 2023, Co-Conspirator #1 used Ragano's first name, his (correct) sentencing date, and provided his workplace address (and offered to show John Doe a photograph of the business where Ragano worked).  On March 25 and June 30, 2023, Co-Conspirator #1 also makes clear that he was collecting payments from a loan Ragano gave to John Doe (CC#1: "[i]t's a fucking loan, you're paying the loan back.").  On March 25 and March 30, 2024, respectively, Co-Conspirator #1 used threatening language, noting "nobody's looking for, nobody's looking for anybody to get hurt" and told John Doe that Ragano was "a little upset" that loan was outstanding.  On April 15, 2023, Co-Conspirator #1 also revealed that he knew Ragano had a court-monitored phone and was prohibited from contacting John Doe (Co-Conspirator #1 to John Doe: "You know [Ragano] has the fed phone, right?  You know he has a fed phone, right? . . . I'll call him, yea <u>just don't say your name</u>.").

Furthermore, the recorded statements will be corroborated by the government's other independent, admissible evidence.  <u>Desena</u>, 260 F.3d at 158.  This includes, among other things, testimony that in 2021, Ragano and Co-Conspirator #1 were close friends and associates,

---

[8]     The statements outlined herein are representative of those the government intends to introduce at trial as direct evidence; this list is not exhaustive, and the government reserves the right to introduce as evidence statements of a similar nature based on the cited caselaw that are not outlined here.

John Doe's testimony concerning the extortionate collections, telephone records showing the frequency of contact and dates of contact between Ragano and Co-Conspirator #1, the January 2, 2023 voicemail message that Ragano placed from Co-Conspirator #1's phone to John Doe, the $3,000 in payment that Co-Conspirator #1 accepted from John Doe for Ragano, and the July 5, 2023 recorded statements by Ragano.[9]

The evidence also demonstrates the third Bourjaily requirement — that the statements be during and in furtherance of the conspiracy — is satisfied. Malka, 602 F. Supp. 3d at 535. Co-Conspirator #1's statements occurred during the timeframe of the charged conspiracy and concern the collection of payments from John Doe to Ragano. Because they relate to the collection of payment, as discussed above, the statements promote or facilitate the carrying out of the charged criminal activity. Gigante, 166 F.3d at 82.

Based on the foregoing, the government respectfully requests an in limine ruling that statements of Co-Conspirator #1 during and in furtherance of conspiracy to make extortionate collections of credit are admissible at trial pursuant to Federal Rule of Evidence 801(d)(2)(E).

---

[9]     In his motion to dismiss, Ragano argued that Co-Conspirator #1 "does not have the scienter to be considered a co-conspirator." ECF Dkt. No. 20. However, it is well-established that "to become a member of the conspiracy, a [conspirator] need not have known the identities of every [conspirator] or have been apprised of all of their activities. Moreover, a [conspirator] need not have been informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his part." Jury Charge, United States v. Zottola, et al., No. 18-CR-609 (HG) (E.D.N.Y.); see United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990) (also noting "[t]here is no requirement that the evidence show that the conspirators "agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.") (internal citations omitted); United States v. Chartier, No. 17-CR-372 (JS), 2021 WL 3795352, at *38 (E.D.N.Y. Aug. 26, 2021) (finding that "[c]o-conspirators' goals need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes.") (internal citations and quotation omitted).

III.     Should Ragano Choose to Testify, the Court Should Permit Cross Examination on Ragano's Prior Convictions

Should Ragano choose to testify at trial, the government intends to cross-examine him, pursuant to Federal Rule of Evidence 609, about two of his prior felony convictions.   In November 2002, Ragano was convicted in the Northern District of New York of conspiracy and theft of public funds for filing fraudulent federal income tax returns, in violation of Title 18, United States Code, Sections 371 and 641.   See United States v. Broten, et al., No. 01-CR-411.   The scheme resulted in his receipt of a nearly $70,000 tax refund to which he was not entitled.   Ragano received a sentence of 30 months' imprisonment followed by three years' supervised release and was ordered to pay restitution.

On or about October 8, 2014, Ragano was convicted in the Eastern District of New York of a collection of unlawful debt conspiracy under federal racketeering law in violation of Title 18, United States Code, Sections 1962(d) and 1963.   See United States v. Asaro, et al., No. 14-CR-026.   The conduct in that case involved a loan that a Bonanno crime family associate had extended to an individual affiliated with the Gambino crime family of LCN.   The loan was extended at an interest rate that was at least twice the enforceable rate under New York state law. Ragano was sentenced to 51 months' imprisonment and three years' supervised release.   He was released from custody in October 2017.   Soon after his supervision was completed in October 2020, he became involved in the loansharking and drug-trafficking schemes that were the subject of the Alimena case.   For the reasons below, the Court should permit cross-examination on both of these convictions should Ragano testify.[10]

---

[10]     The government respectfully reserves the right to move to admit evidence of Ragano's convictions in Alimena pursuant to Rule 609, should the Court deny the government's request to introduce that and related evidence in its case-in-chief.

A.    <u>Applicable Law</u>

Federal Rule of Evidence 609 governs the admissibility of evidence of prior convictions for impeachment purposes.  If the witness is a criminal defendant, evidence of a prior felony conviction "must be admitted" "if the probative value of the evidence outweighs its prejudicial effect to that defendant." Fed. R. Evid. 609(a)(1)(B).  Moreover, evidence of any crime "must be admitted if the court can readily determine that establishing the elements of the crime required proving — or the witness's admitting — a dishonest act or false statement." Fed. R. Evid. 609(a)(2).

If more than ten years have passed since the completion of the defendant's term of imprisonment for the prior conviction, evidence of the conviction is admissible only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect."  Fed. R. Evid. 609(b); <u>see</u> <u>United States v. White</u>, 312 F. Supp. 3d 355, 358 (E.D.N.Y. 2018).  In addition, for convictions falling outside the ten-year marker, under Rule 609(b), a court must "make an on-the-record finding based on specific facts and circumstances that the probative value of the evidence substantially outweighs the danger of unfair prejudice." <u>Jones v. N.Y. City Health & Hosps. Corp.</u>, 102 F. App'x 223, 226 (2d Cir. 2004) (summary order); <u>see also</u> <u>United States v. Payton</u>, 159 F.3d 49, 57-58 (2d Cir. 1998) (upholding district court's decision to admit defense witness's 13-year-old convictions where court found that witness's "credibility was 'crucial' because she would be testifying in direct contradiction to the government's witnesses on the key element . . . ; the impeachment value of her convictions was substantial; and the government provided defendant with sufficient advance notice of its intent to use these convictions in her cross examination").

In weighing the probative versus prejudicial value of impeaching a defendant with a prior conviction, courts generally consider five factors: (1) the impeachment value of the prior

crimes; (2) the date of the convictions and the defendant's subsequent history; (3) the degree of similarity between the past crimes and the charged crime, with dissimilarity favoring admission; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue. See United States v. Hayes, 553 F.2d 824, 828 (2d Cir. 1977); Jones v. City of New York, No. 98 Civ. 6493 (LBS), 2002 WL 207008, at *2 (S.D.N.Y. Feb. 11, 2002).

Under Rule 609(a)(1), the "evidence" of prior convictions that may be admitted includes "inquiry into the 'essential facts' of the conviction, including the nature or statutory name of each offense, its date, and the sentence imposed." United States v. Estrada, 430 F.3d 606, 615-16 (2d Cir. 2005); see also United States v. Brown, 606 F. Supp. 2d 306, 315-16 (E.D.N.Y. 2009) (same).

B.    Ragano's Prior Convictions Should Be Permitted on Cross Examination

1.    The Unlawful Debt Collection Conviction

The government should be permitted to cross-examine Ragano with respect to his 2014 unlawful debt collection conviction. The factors enumerated above weigh in favor of permitting inquiry on this conviction.

With respect to the first factor, the impeachment value of the prior crime, "Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully." United States v. Estrada, 430 F.3d 606, 617 (2d Cir. 2005); United States v. Crumble, No. 18-CR-032 (ARR), 2018 WL 2016852, at *5 (E.D.N.Y. May 1, 2018) ("Indeed, the Second Circuit has 'admonished' district courts that even felonies that 'do not bear directly on honesty such as to be automatically admissible under Rule 609(a)(2) [] may nonetheless be highly probative of credibility.'") (citing Estrada, 430 F. 3d at 616). The Second Circuit has upheld the admissibility of convictions for a range of offenses, including economic and property crimes, to evaluate a witness's truthfulness. See, e.g., United States v. Hourihan, 66 F.3d 458, 464 (2d Cir.

42

1995) (possession of stolen property); <u>United States v. Hawley</u>, 554 F.2d 50, 53 (2d Cir. 1977) (attempted burglary).

The second factor, the date of the convictions and the defendant's subsequent history, also weighs in favor of admission. Ragano was released from custody for this offense well within ten years of the trial scheduled in this case, <u>see</u> Fed. R. Evid. 609(b), and soon thereafter began to engage in illegal conduct again, resulting in yet another federal conviction in the <u>Alimena</u> case, <u>see</u>, <u>e.g.</u>, <u>United States v. Gilbert</u>, 668 F.2d 94, 97 (2d Cir. 1981) (affirming admissibility of prior conviction where "the age of the prior conviction and the defendant's subsequent history did not suggest that he had abandoned his earlier ways"); <u>c.f.</u> <u>United States v. Elias</u>, No. 18-CR-33 (S-2) (NGG), 2022 WL 715486, at *6 (E.D.N.Y. Mar. 10, 2022) (absence of subsequent convictions "weighs against admission" of an older prior conviction).

With respect to the third factor, similarity to the instant crimes, Ragano's debt collection conviction does on its face resemble his current charges for extortionate collection of credit. However, any risk of prejudice can be sufficiently mitigated with a proper limiting instruction to the jury indicating that the prior conviction was offered only in connection with Ragano's credibility.

Most significantly, the fourth and fifth factors—the importance of Ragano's testimony and the centrality of the credibility issue—weigh heavily in favor of admissibility. Whenever a defendant testifies and denies having committed the charged offense, he places his credibility directly at issue. <u>See</u> <u>United States v. Alexander</u>, 48 F.3d 1477, 1489 (9th Cir. 1995). Regardless of the substance of the defendant's testimony, once he places his version of the events before the jury, his credibility becomes central to the jury's determination of the case. To permit the defendant to take the stand and appear "pristine" would be "unfair and misleading to the jury."

43

United States v. Ortiz, 553 F.2d 782, 785 (2d Cir. 1977).  The circumstances here make this especially so.  Were Ragano to testify at trial, his testimony would likely focus not on the fact of the loan but rather on his particular intent and state of mind during his collection of payments from John Doe, a critical element of the offense, as described above.  This puts Ragano's credibility front and center.  He should not be permitted to deny his intent to instill fear in John Doe without a proper evaluation of his credibility.  The government should be permitted to cross-examine Ragano surrounding a conviction that necessarily bears on his truthfulness and willingness to abide by the rules so that the jury can make its own assessment.

### 2.    The Fraudulent Tax Return Conviction

The government should also be permitted to cross-examine Ragano with respect to his 2002 fraudulent tax return conviction.  Such a conviction unquestionably involves dishonesty, as contemplated under Rule 609(a)(2).  See, e.g., Sanders v. Ritz-Carlton Hotel Co., LLC, No. 05-CIV-6385 (PKL), 2008 WL 4155635, at *3 (S.D.N.Y. Sept. 9, 2008) (conviction for conspiracy to defraud the Internal Revenue Service, income tax evasion, and providing false statements to the government constituted a conviction involving dishonesty or false statement as contemplated by Rule 609(a)(2)); Peyton, 159 F.3d at 57 ("Doretha Payton's conviction for making a sworn false statement to a government official is obviously a crime of dishonesty and false statement by virtue of its title alone.").

Turning to the five-factor analysis, the impeachment value of Ragano's tax fraud conviction is indisputably high given the involvement of dishonesty and false statements.  Courts have recognized the crucial impeachment value of this and similar offenses even when, as here, the conviction and sentence are more than ten years old and are thus subject to heightened scrutiny under Rule 609(b).  See, e.g., Peyton, 159 F.3d at 57-58; Sanders, 2008 WL 4155635, at *4-5 ("[T]he impeachment value of the tax conviction is high because Sanders was specifically

convicted of making false and fraudulent statements to the government, which bears on Sanders's credibility as a witness.  Courts have admitted old convictions into evidence when the conviction is in the nature of <u>crimen falsi</u> and the credibility of the witness is of great import to the issues of the case.") (citing cases); <u>United States v. Chervin</u>, No. 10-CR-918 (RPP), 2013 WL 124270, at *5-6 (S.D.N.Y. Jan. 10, 2013).  Moreover, as noted above, the conviction was not a distant outlier but rather was followed by continued criminal conduct and multiple additional convictions.  Nor does it bear any similarity to the instant offenses.

Finally, with respect to the remaining factors, as described above, Ragano's credibility will become central to the case were he to testify as to his state of mind and intent. <u>See</u> <u>Chervin</u>, 2013 WL 124270, at *5-6 (approximately 15-year-old fraud conviction admissible where "the Defendant relied upon a good faith and lack of knowledge defense grounded in his own testimony, and thus the credibility of that testimony was crucial"); <u>Gilbert</u>, 668 F.2d at 97 (affirming decision to admit conviction for mail fraud, even though the conviction was more than ten years old, because the credibility of the witness would be crucial, the impeachment value of the fraud conviction was high, the two crimes were not so similar as to invite improper inferences, and the age of the prior conviction did not suggest that the witness had abandoned his earlier ways).  Accordingly, as outlined herein, the probative value of this evidence "substantially outweighs its prejudicial effect."  Fed. R. Evid. 609(b)(1).

IV.  <u>Evidence or Argument Suggesting Selective Prosecution or Improperly Impugning the Government's Investigatory Conduct Should Be Precluded</u>

Finally, Ragano should be precluded from introducing evidence or making arguments before the jury that seek to impugn or otherwise put at issue the government's conduct or motive in its prosecution of this matter.  Ragano has already raised similar allegations in his motion to dismiss the Indictment.  <u>See</u> ECF Dkt. No 20.  Such evidence and argument is irrelevant

to Ragano's innocence or guilt and presents a substantial risk of misleading the jury or inviting jury nullification.

Courts have consistently held—and often give jury instructions reflecting—that arguments regarding the government's decisions during an investigation and its motives and timing in bringing charges are irrelevant, unduly prejudicial, and improperly invite jury nullification.  See, e.g., United States v. Saldarriaga, 204 F.3d 50, 52 (2d Cir. 2000) (affirming jury charge stating that "[t]he government's function is to give enough evidence to satisfy you beyond a reasonable doubt that the charges are true, and the fact that there are a thousand other things they could have done is wholly irrelevant" (internal quotations and alterations omitted)); United States v. Rosado, 728 F.2d 89, 93 (2d Cir.  1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"); United States v. Preldakaj, 456 F. App'x 56, 60 (2d Cir. 2012) (affirming instruction that "[y]ou have heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were not used by law enforcement authorities[, but t]he government is not on trial, and law enforcement techniques are not your concern"); United States v. Knox, 687 F. App'x 51, 54-55 (2d Cir. 2017) (instructing jury that "government is not on trial" is "appropriate" (internal quotations omitted)).  That is so because a claim that a prosecution has been brought selectively, or from improper motives, "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."  United States v. Armstrong, 517 U.S. 456, 463 (1996).  "Because it involves a defect in the institution of the prosecution, the selective prosecution defense is an

issue for the court rather than the jury." United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997) (internal quotations omitted).

Courts also consistently exclude a defendant's attack on the prosecution's motivation or methods in initiating its prosecution, including arguments that a defendant was improperly targeted. See, e.g., United States v. Farhane, 634 F.3d 127, 167 (2d Cir. 2011) (affirming district court's ruling precluding defendant from arguing in summation that government had improperly targeted him for prosecution); United States v. Loera, No. 09-CR-466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) ("[S]elective-prosecution argument by defendant to the jury would . . . be improper"). The Court should do the same here. See United States v. Jeffrey Webb, et al., No. 15-CR-252 (PKC), ECF No. 1275, Trial Transcript at 3630:09-3632:12 ("[M]aking argument in the vein of selective prosecution or the government's motive in conducting its investigation; for example, not getting certain evidence or pursuing certain leads and potentially focusing on certain defendants is . . . inappropriate" at trial.).

The jury's attention belongs on "the evidence or lack of evidence that had been presented at trial," Saldarriaga, 204 F.3d at 52, not on the government's investigative decisions or motives. Evidence concerning such matters is irrelevant, and introduction of evidence or argument concerning the timing or motives behind the government's investigation would, in addition, present an unacceptable risk of confusing the issues and misleading the jury. The Court should preclude any such evidence or argument. See, e.g., United States v. Stewart, No. 03-CR-717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); United States v. Reese, 933 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2013) ("[A] defendant 'may not argue before the jury issues relating to the

overall propriety of the Government's investigation in this case.'") (quoting <u>United States v.</u> <u>Demosthene</u>, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004)).

In his motion to dismiss the Indictment, Ragano made several arguments that should be prohibited at trial. As to John Doe, Ragano claimed, "it was [John Doe] who orchestrated the commission of those alleged 'crimes.'" ECF Dkt. No. 20, at 14. As to the government, Ragano alleged that until July 5, 2023, "the government had been in a fruitless search for evidence of a crime which did not exist" and that

> [i]ndeed, for at least six months, the government had been unsuccessful in eliciting an admission by the defendant concerning an extortionate attempt to collect an unpaid loan. Federal agents who were monitoring the meeting with the defendant must have been desperate to induce an admission in order to attempt to bolster an investigation otherwise lacking evidence and obtain what they would have anticipated potentially could be important evidence.

<u>Id.</u> at 6 (footnotes omitted). Ragano continued, "It is a fair question to ask if this was a deliberate, preconceived strategy to provoke the defendant who may have been perceived as somewhat volatile and making him susceptible to an excited reaction." <u>Id.</u> Ragano also noted that "notwithstanding this allegation, the government never attempted to request the revocation of the defendant's bail." <u>Id.</u> at 14. None of these claims have any bearing on the Ragano's guilt or innocence for the charged crimes. The Court should preclude Ragano from presenting arguments or evidence that would invite the jury to question the government's motives in investigating and indicting him.

<u>REQUEST FOR SEALING</u>

The government respectfully requests that this letter be filed under seal and that portions of this letter pertaining to the testimony of one or more witnesses whose identities may be identified by information contained in the letter be redacted for public filing. The risk to the

safety of these witnesses outweighs the public's right to disclosure.  United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995) (need to protect the integrity of an ongoing investigation, including the safety of witnesses, may be compelling reason to justify sealing).  Moreover, unsealing this letter, and thus potentially revealing witness identities publicly will likely harm the ability of law enforcement to secure current and future cooperation from persons similarly situated, a fact that also weighs against public disclosure.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court grant the government's motions in limine.

Dated:          Brooklyn, New York
                July 26, 2024

                                        BREON PEACE
                                        United States Attorney
                                        Eastern District of New York

                        By:     /s/
                                        Devon Lash
                                        Andrew D. Reich
                                        Assistant U.S. Attorneys
                                        (718) 254-7000